May it please the Court again, I am still Alexandra Robert Gordon on behalf of the Defendant Appellant Cross Appellee Attorney General Becerra, and I would also like to reserve four minutes for rebuttal if it's acceptable to the Court. That's fine. So this case, as the Court has already acknowledged, presents very similar legal issues and very similar legal errors. In particular, the District Court excused the plaintiff from meeting the demanding burden of showing harm arising from, that's really annoying, from the First Amendment, sorry, First Amendment harm arising from a disclosure to the Attorney General. And essentially applied a watered-down version of the flexibility and proof that has been afforded to minor parties under Buckley. The Foundation is very obviously not a new or minor party. Among other reasons, it has been actually disclosing its major donor information to the IRS for many years and notably has produced absolutely no evidence of any harm coming to it from that disclosure. The District Court also overlooks some facts that I think make it virtually impossible for the Foundation to establish First Amendment harm. And that includes public disclosure. Similarly to the Law Center, half of the Foundation's donors for every year are private foundations that have to disclose. And there is no traceable harm to those people. Similarly, in the record, there have been times where a Schedule B or a donor, an even larger donor list, because their Schedule B has only four to ten donors in any given year. You need to contribute a quarter to half a million dollars to even show up on the Foundation Schedule B. So if four people, four major donors were to withhold their contributions, that would be a million dollars, wouldn't it? It would, Your Honor. So the fact that it's high cutoff, it just increases the impact of a loss of a donor, doesn't it? Well, possibly. But first of all, that would be one million out of about 20 million in contributions that the Foundation takes in every year. And then it's not actually enough just to show a decrease in donations. You have to show that this is a decrease in donations such that your movement cannot survive. This is the case in Brown v. Socialist Workers Party. This is some of the concern that animates the cases involving the NAACP. So this court has said in Family Pack v. McKenna, for example, that merely saying yes, and the Supreme Court said it in Buckley, yes, you may have some loss in donations, although here there's no evidence of that happening. And the entities on the Schedule B that are forced to publicly disclose by law or because they want to have suffered no appreciable harm coming from that disclosure. In fact, the Foundation actually began recommending that major donors publicly disclose their donations to the Foundation and its affiliates, and some did in op-eds. And by the time of trial, the testimony was that there was no harm that could actually be linked to that public disclosure. So given that no disclosure, not to the IRS, of Schedule B information, and not publicly, has ever led to any harm, this simply can't meet what is a very demanding burden to show harm arising from a disclosure requirement. Again, because that is the case, we are solidly within the holding of Center for Competitive Politics. That would be a facial challenge, and it is precluded by the court's holding in Center for Competitive Politics. But even if we're to go back and look at the requirement and to see whether the state's compelling interest is substantially related, the evidence at trial more than supports the fact that it is. The district court, in contravention of this court's holdings in Center for Competitive Politics and Americans for Prosperity Foundation, applies both a narrow tailoring requirement, which does not exist, and a least restrictive means requirement, which does not exist. Now, in fact, the requirement could actually pass both of those, because in terms of fit, fit is judged in the cases of strict scrutiny as doesn't stifle any more fundamental liberties than it has to. Here, no fundamental liberties are being stifled. Or whatever your objective is would be achieved less effectively absent the regulation, which is also the case here. There is substantial evidence of that in the record. So the district court essentially has a combination of errors, excusing the foundation from meeting its burden, and then applying a burden that I don't even want to call it strict scrutiny, because even under strict scrutiny, what the district court was demanding of the government is not actually required. It doesn't have to be the case that you have to prove that every Schedule B is reviewed coming in the door and that it's used all the time by everyone. It doesn't have to be that it's sort of a magic bullet, and so in and of itself, you just know. Didn't he just apply a less demanding exacting scrutiny standard? Isn't that what he did? I'm sorry, a less demanding exacting scrutiny to which end of the analysis? At the beginning. At the beginning, I would say it's not recognizable as a standard. So I guess you could say it's a much less demanding threshold than was set forth by this court in Americans for Prosperity, in Dole, by the Supreme Court in Buckley, by the Supreme Court in Doe v. Reed. There's just nothing in any case that sort of says, well, because people who are publicly affiliated with you have suffered some harm, some negative consequences, and the bulk, if we exclude the Koch brothers, which this court has already said evidence of that is in no way probative, the bulk of what we're really talking about for injury here is disparagement. There are blog posts that people don't like, articles that bother them, and then just sort of a general desire to be anonymous. There appears to be an assumption on the part of the district court that, contrary to the law, that disclosure is inherently harmful and that there is some fundamental right to anonymous donation, which there explicitly is not. And so harm, in a sense, I think is almost presumed. And then anything, you know, any negative thing that ever happened to anyone who's remotely affiliated with you, even though it doesn't have to do with this kind of disclosure or any disclosure, was acceptable to the district court. That just cannot be squared with this court's holdings in this precise case or any holding by any court looking at First Amendment injury and what's required. I think because this is largely repetitive, I want to ask the court if it has any questions. I do have a question coming back to the confidentiality. I thought there was some reference to a quality control process. Is it a sampling process? Could you amplify on what that is all about? Yes, Your Honor. To test whether or not these errors are, in fact, reduced, as you say, to near 100 percent. So if I understand the question and also if I understand the evidence, there are a variety of quality control measures that have been, first of all, have always existed and now have been instituted. When looking at the sort of disclosures that were, or the Schedule B or confidential documents that were inadvertently housed on the public-facing website, the pattern that seemed to emerge is that the bulk of the error occurs actually, like, when a human gets a Schedule B and uploads it in the first case. So there's been a lot of attention placed on making sure that that doesn't happen in the front end of the process. Then there are also protocols run with various search terms to make sure that no Schedule B is in the wrong place, actually, in the website. And I think this kind of a scan goes on consistently. Does that answer your question, Judge Fischer, about what the... I guess so. It is what it is. Yes. Okay. And again, you know, the... protocol or policy reflected is, like, in a written memorandum that's disseminated, and employees of the Registry are trained to implement those procedures, because it sounds like you're describing that it's a constant and ongoing process of checking and double-checking to make sure that the confidential Schedule B doesn't land on the public-facing website. Yes. So, first of all, there is now a formal regulation, and everyone at the Registry is familiar with that. The testimony is that everyone in the Registry has always been aware that it is supposed to be a confidential document, that it does not get put on the public-facing website, but that sometimes there were mistakes. In the training that goes on, the Registrar has testified that, yes, he absolutely trains his staff about what is confidential and what isn't. But Schedule B is not the only confidential document that the Registry deals with. So there's a lot of... Right. No, I'm talking about the new policies and procedures, the protocols that have been put in place to prevent the inadvertent disclosure from occurring again. Yes. David Eller did testify that he has, in fact, trained his staff, particularly the staff that is responsible for the initial uploading. The consistent checking is done by a fairly small number of people. It's a pretty small staff. And so Chris Harriman, and there's testimony from him, he's in charge of information technology for the Registry. He's extremely aware of what is going on. And, yes, he testifies that they are, and David Eller, that they are running these checks. The checks sort of after the initial uploading mistake, and, again, there are people who are double-checking the uploading, like even at the front end, are done mostly by David Eller and Chris Harriman. So that is where that comes in. The counsel in the other case mentioned that there are no penalties for people who violate protocol or protocols inadvertently or intentionally, for that matter. Is that true? That is not true, Your Honor. It is the case that, unlike the IRS, we do not have criminal penalties for people who make – actually, I don't think – let me take that back. I don't think the IRS has criminal penalties for making a mistake. It has criminal penalties for willfully disclosing confidential information. We do not have criminal penalties, but in the government code, I think it's section 19900 that deals with incompatible activities, you can be fired. So if somebody actually willfully were disclosing a Schedule B, they would lose their job. That is a penalty. For mistakes, the testimony shows that they get trained, and if that doesn't work, they get reassigned someplace where they're not going to be dealing with confidential information. So it is not the case that there are no consequences. You want to say there's a balance of your time? I do. Thank you. Okay. Good morning, Your Honors. May it please the Court. Derek Schaffer for Americans for Prosperity Foundation. Your Honors, our factual record and our posture have changed considerably since last these appeals were before the Court. We now, as Your Honors have noted, have had a full multi-day bench trial with fulsome testimony and proof. We have had findings, extensive findings that are reviewed for clear error. And unlike in the preliminary injunction context, now there's a record that determines actual success, not just likelihood of success. And I would like to pinpoint, if I may, over the course of my time, three critical respects in which I think the factual premises have changed. First, the Schedule Bs in fact have no genuine utility for law enforcement. I'd like to elaborate on why and provide the record citations for it, and that's what the District Court has found. Second, the Attorney General's confidentiality assurances have been exposed as hollow and false. I don't say those words lightly. We've got a heavy record on it and extensive findings about it. And third, the chills and harms and threats faced by Americans for Prosperity Foundation and its supporters are in fact real and they are concerning. That's why we're here, Your Honors. And because this case involved heightened constitutional scrutiny, as Judge Pai, as you said, exacting scrutiny, the facts matter. The facts matter. This is not rational basis for view, Your Honors. The government doesn't just come here and hypothesize how they might use Schedule Bs. It comes down to them showing the requisite relationship between their dragnet requirement that all Schedule Bs, various sensitive documents, be filed by all registered charities revealing all of their top donors nationwide. They need to justify why that is necessary. They need to prove that there is, that they've narrowly tailored the policy around their justifications, and of course they have to answer any proof of a chilling effect. But the point is, Your Honors, this is not a mere economic regulation. Everyone agrees that Your Honors have to be looking at the government's proffered justifications and proof. When you do, we respectfully submit it's an easy case. Let me ask you on that point. So in Center for Competitive Politics, we said that the Schedule B requirement is substantially related to the state's interest in overseeing charitable organizations. And Judge Pai, as I of course know better than to claim, I know that opinion better than Your Honor. I'm just, that's what the opinion says. It does, Your Honor. So let me ask you this. How can the evidentiary record undercut that legal determination that we made? Your Honor said what you said in the context of a preliminary injunction, where necessarily you are speaking to likelihood of success. I think the opinion makes that clear at other points. It's only pure issues of law as to which the Court's published opinion controls. And in the context of intermediate scrutiny, it is very fact intensive. This Court has noted that citing the Supreme Court's decision in Turner involving First Amendment scrutiny and analysis of the government's proffered justifications So whether the State has an interest is a legal determination, is a factual determination or a legal determination? I would say this, Judge Pai, is whether the policy in fact substantially relates to the government's proffered interest. We're not here to argue, Your Honors, the State doesn't have a law enforcement interest. It does. And if they perceive that in good faith that a charity is running afoul of their laws, they're entitled to investigate as they do, Your Honor. They have a number of means to do that. They have audit letters. They have subpoena authority, et cetera. That's not the policy that we're challenging, Your Honors. The policy we're challenging is the prophylactic upfront requirement that every registered charity, as a condition of its registration, file its Schedule B with California. And you're right, Judge Pai, is that I think in looking at that in the preliminary injunction context where the district court had denied a preliminary injunction and you were reviewing only for abuse of discretion, the court wrote what it wrote. My respectful submission is there's a necessary important caveat on that, which is it's going to depend on what the government is able to show on a full record at trial. This Court took that approach, for instance, in the video game retailers and manufacturers association. Again, First Amendment scrutiny went up to the Supreme Court. This Court looked carefully at the government's proper justifications, found that the evidence of it was wanting, specifically critiqued it. The same thing happened, Your Honor, with respect in the Acorn case. So let me ask you this. Is your argument that the evidentiary record here shows that they only utilize the Schedule B one or two times? Here's the record. In enforcing their oversight and carrying out their oversight of charitable organizations and, therefore, it's just a de minimis kind of tool that? Let me speak to what the record says on this. All right. The district court found based on the 3B6 testimony from the Attorney General's designee that the Schedule B had been used about in five identified instances for the past ten years, Judge Pius, where the Schedule B actually mattered. That was out of 556 or some odd investigations that the Attorney General's office had conducted over those years. The record also reflects, it confirms, the Attorney General's never looked at tens of thousands of Schedule Bs when they come in. In fact, they only noticed in 2010 that a half to two-thirds of charities weren't even filing the Schedule Bs. They woke up and realized that. As the district court noted, the only logical explanation for why the State wouldn't have noticed all these missing Schedule Bs is that they weren't using them from a law enforcement perspective. And, in fact, Mr. Baumann, the 3B6 designee, also testified, as I mentioned, that they don't look at a Schedule B until a complaint comes in. And then, Judge Pius, when a complaint comes in, you have it from Ms. Avanias, you have it from Mr. Baumann as well, they invariably go to the charity and say, we are investigating you, give us all of your documentation. They want to make sure they have everything. They want to make sure it's up to date. And they get that, pursuant to audit letters, invariably. And although Ms. Gordon articulates why they might potentially be concerned about tipping off a charity or having to wait on this information, there is not a single identified investigation where that ever happened. And Mr. Baumann affirmatively testified he's never experienced that. I can give you the pinpoint citation to it in the record. But Mr. Baumann specifically said, and it's in excerpts of record, I think it's 981 and 82, and 988 and 89, he's their lead auditor who's been there for 30 years. He's never known of an instance where that in any way impeded an investigation going through that process. And of course, Your Honors, they do that again every time. So they're not concerned about following that sort of a process quite clearly. So let's just assume for a minute that we conclude that the government, that collecting the Schedule Bs is a substantial interest that the government has, that the State has in overprovising charitable organizations. What's your next argument? And I will move on, Judge Pius. One last point, because Ms. Gordon specifically claimed there was one instance, she identified one instance where hundreds of millions of dollars, charitable fraud was supposedly uncovered, that was her word, through the use of the Schedule B. Actually, that instance involves LB research. The evidence is undisputed that that was an instance that had been reported to the State of California. It was a multistate investigation that involved the States that have filed an amicus brief in support of our challenge seeking facial invalidation saying they didn't need the Schedule B. And in fact, it was years into the investigation that the relevant witness realized, oh, before I take this deposition, the Schedule B may be important to this. So that actually disproves the notion that they have a preinvestigation need for a Schedule B. But to take, Judge Pius, your suggestion, moving on, I think it should be agreed, it should be a shared premise, that there has to be narrow tailoring of the policy. That is what exacting scrutiny means. And the Supreme Court specifically held there needs to be that narrow tailoring in Shelton. It's there. It did that in Louisiana. The NAACP case, the same fact pattern, making clear there needs to be narrow tailoring. And this Court has insisted upon narrow tailoring. Judge Fischer, it happened in Perry v. Schwarzenegger where there was a private subpoena that was found violative of the First Amendment because it had not been properly tailored. And in fact, you can't compare the means to the ends without looking at tailoring. That is a fixed feature of heightened constitutional scrutiny. And there is literally not a single case, it is a null set, that the Attorney General consites, Your Honors, where a court said we are not requiring narrow tailoring in the context of exacting scrutiny. And once you require that, Your Honors, this becomes an easy case, Judge Pius, even if you assume there is otherwise a substantial relationship. The record is very clear that the Attorney General never considered any less restrictive alternative. They acknowledge it. Let me just make sure I understand your argument on this point. What is the case that says that when we apply exacting scrutiny, we also need to be sensitive to narrow tailoring? I point, Your Honor, to – What case? Shelton. Shelton? Shelton involving teachers' demand for their associations. One of the fatal flaws identified by the Supreme Court is that it had not been narrowly tailored. The same was true in Louisiana v. NAACP. The Supreme Court specifically insisted on narrow tailoring. And again, I think Your Honors have done it. This Court has done that. In Perry v. Schwarzenegger, in the Dole case, these fact patterns are this fact pattern, Your Honor, and there is just not another case that goes the other way when looking at this specific question. Can you address, Counsel, the evidence in the record that having the Schedule BE readily accessible to the AEG increases their efficiency in that when the complaint is initiated, they look at the entire picture of all the documents that they have in order to determine how to shape the investigation, what to ask for. There's also testimony of concern that asking for the Schedule BE directly from the charity might tip off the charity, would somehow slow down or impede the investigation, that the IRS sometimes takes weeks to return it to them. So even if you're correct that there's some sort of narrow tailoring, there is evidence in the record of a need to have the Schedule BE on hand when a complaint is investigated. And how do you suggest that we deal with that? Judge Winn, I would expect that sort of an argument to come in a rational basis case, where the AEG says essentially, look, we might want to use it for all the reasons you just articulated, and in a way that the Attorney General's lawyers have hypothesized in court and some of their witnesses did in the abstract. But the proof is in the pudding, Your Honors. It is clear the Attorney General has not considered any less restrictive alternative. That was made clear in their interrogatory response. They acknowledged that. You can find that at Supplemental Excerpts of Record 108, the response to our interrogatory number nine, and in Ms. Ivana's trial testimony, 1030 to 32. They confirmed they've never thought about, can we get after this very sensitive and dangerous information in a less restrictive way? So you have that from the State. And as to Your Honors – But what's the less restrictive means, other than is it an all or nothing? Collect them all up front and have them readily available, even though the same information's already been disclosed to the IRS? Or basically not have them at all and then reach out to the charity itself or the IRS for the information once a complaint has been initiated? Let me give you the easiest one, Judge Nguyen, without speaking to other cases. With serious confidentiality enforcement. And I will speak to that. The sort of confidentiality that the IRS guarantees and enforces. That would be a less restrictive way. It would be less dangerous and problematic for charities to collect Schedule Bs if they did that in a thoughtful and carefully controlled way. Which is – I will speak to this in a moment. But that is not the policy that comes before you. And in addition, Judge Nguyen, I think it would be the case that the Attorney General, if they could document – say, we've had instances where demanding a Schedule B through an audit letter has been ineffective. That would be one thing. But, Your Honors, for years and years and years, back to 2001, the foundation has been registered with California. It never filed its Schedule B. That's true for tens of thousands of charities. And as the district court found, there's no logical explanation for why the Attorney General would have been going without all of these countless Schedule Bs if Judge Nguyen, when they got to an investigation, they said, where's the Schedule B? We need to have that. We need to get going on this investigation. We're concerned about the delays and the problems we're going to encounter if we have to go asking for it from the charity. The evidence is they were doing that for a decade without anyone in the Attorney General's office noticing, which I think, you know, gives the lie to this notion that they really do need this. But in addition to that, you have the testimony from Judge Baumann that – sorry, from Mr. Baumann that I was alluding to. You can find it in excerpts of record 988 and 89 and supplemental excerpts of record 981 and 82. And from Ms. Zavagna is an excerpt of record 1029 that says it is their uniform policy today to request not only the Schedule B, but all the other documentation the charity has, regardless of whether the Attorney General has it on file. So they are collecting this information redundantly in a way that will predictably lead to thousands upon thousands of Schedule Bs and protected donor information because there are many donors on every Schedule B slipping out. That, to us, is antithetical to meeting exacting scrutiny and establishing narrow tailoring. And I want to turn to confidentiality, Judge Fischer, which you asked about at the outset. And I know my time is going short, Your Honors. I would – Go ahead. Oh, thank you, Your Honor. Ms. Gordon said that the findings about confidentiality are not tethered to First Amendment analysis. I just don't think that's true. It matters to the chill. We think it matters to facial invalidity. What do you think charities and donors across the board are going to experience? There are nine amicus briefs in support of us that are concerned about the concerns that result from a lack of serious, meaningful confidentiality. And, of course, as we were talking about, for less restrictive means, Judge Winn, it would be very easy, I respectfully submit, for the Court to hold, look, if you're going to collect confidential sensitive donor information, you, the Attorney General at the outset, need to be protecting that information. And that is not what the record reflects here. According to Ms. Gordon, the confidentiality policy is working 99.9 percent of the time. I don't know how she does that math, Your Honors. She's comparing that across all of the public documents that are filed with the registry. They've never disclosed to us in this litigation, although we asked, how many of those documents are confidential and how many of the confidential documents are Schedule B. So I think it's a misleading denominator. But in fairness to Mr. Eller, the current head of the Registrar, you can find his testimony in excerpts of Record 954 and 956 where I asked him, are you suggesting, as your lawyers have argued, that to have more than 1,700 Schedule Bs publicly posted on the website, that's an acceptable number? And he totally disagreed with that. He said, that's not the case. It's higher than I would like. He was answering the question, is that an unacceptably high number? And it is unacceptably high, Your Honors. It's also just the tip of the iceberg. I want to emphasize that the record reflects that hundreds of thousands of confidential documents, including all Schedule Bs ever filed with the registry while this litigation was ongoing, they were publicly available on the website. They weren't there via links. But because of how the Attorney General's Office was handling those, anyone could go through a sequential list of documents. I'm looking at the first filing by the Foundation, and now it just skips to four. And you put in two or you put in three in your web browser, voila, you land on confidential documents, including Schedule Bs. There were hundreds of thousands of documents that were accessible that way. The Attorney General's Office, during the litigation, identified that exposure, had IT people who were recommending fixes, including taking down the website temporarily. And Ms. Avanias, who supervises the registry, sat on that for a full week without doing anything about it, never reported the risk to charities, never reported the risk to donors, never reported anything to the public. We found out about it through depositions and through discovery in this case. You can read the testimony on this in Excerpts of Record 937 of 47. That's Mr. Eller, and 1036 to 41. That's Ms. Avanias. There's also, Your Honors, right through the present as best we can tell, a total failure to police third-party vendors who are in possession of Schedule Bs. Heinz is a vendor that does the scanning of all these documents, and Pacific Storage then warehouses them. And we asked Mr. Eller what he's done to ensure that those vendors are properly handling Schedule Bs, along with other confidential documents. What are their protocols? What is public access to them? Have you told them, Mr. Eller or anyone else from the registry, have you indicated to them, we've had 1,800 or 1,700-plus Schedule Bs that were miscoded that we had not identified as confidential for you? So you need to protect those as confidential now going forward? None of that had happened, Your Honors, even when Mr. Eller was on the stand. You can read about that at Excerpts of Record 928 to 36. In terms of penalties, even before we get to penalties, Judge Fischer, the testimony is that Ms. Ivanez, who superintends the registry, maintains that inadvertent disclosure of Schedule Bs is not even a breach under their policy. All the regulation does is codify prior policy, but she says inadvertent disclosure is not a breach. Every single Schedule B ever given to the registry, they could all be uploaded, and in Ms. Ivanez's interpretation, that is not a breach, according to California. That you can find at Excerpts of Record 1033 to 34. There has been the systematic disregard and sloppiness that we identified, Your Honors, in terms of how these Schedule Bs are processed and how they're posted. What is clear, if you set aside Ms. Gordon's testimony, essentially, about the supposed penalties for breach of the confidentiality policy, not a single employee, not a single third party, according to what we can tell Your Honors, has ever been penalized. Supposedly, they can be retrained, and Ms. Gordon says they can be reassigned. There's not a single instance where that happened in connection with any of these Schedule B failures that we've identified in the record and that the district court found occurred. Okay, so I've let you go over three minutes. I apologize, Your Honor. I just want to turn, if I could, to one other thing, if I may. What's the point you want to make? Quick. The claim, Judge Pius, is that only an expert going through the whole website could have found this. In fact, the registry had identified very serious breaches of Schedule B confidentiality going back to 2008, 2012.  Never reported, Your Honors. It wasn't reported to this court. The submissions were that there's no evidence that there had ever been an inadvertent disclosure that was submitted in this case and in CCP. And, in fact, the registry was writing letters to charities with Ms. Johns, the predecessor of Ms. Evania, saying, I know of no inadvertent disclosure ever happening, even after the registry had identified and had pointed out to it these very serious breaches. And even in the interrogatory response we got, the position was, well, it's only happened twice, even though there were dozens of times. And that is important, Judge Pius, because from the perspective of a reasonable donor and a reasonable organization, the Attorney General can come in here and say, we have a confidentiality regulation caught up on what we've already said, but there's still reasonable room for grave concern. That's my submission, Your Honor. If I may turn to the evidence in itself. That's it. Four minutes. Thank you. We appreciate your arguments. We've got it. You had a very thorough brief. Thank you. All right. I'm going to work backwards, just addressing the few additional points that were made about confidentiality first. The weakness that Mr. Schaffer is alluding to was a weakness in a software that the registry purchased from a third-party vendor. It was discovered by Chris Harriman, our IT person. And what was concluded, basically, and the reason why the website was not taken down during that week, is that the structure of the website makes it extremely unlikely that of the website and to look for patterns and gaps in a hexadecimal ID system of documents would not actually be able to figure out this weakness. Again, the only two people who discovered it, one, it's because it's his job to look at the structure of the entire website. The testimony from him about this is at ER 843 to 66. That's Chris Harriman. And it explains how the calculus was made, actually, to leave the website, which we're statutorily obligated to maintain up. Finally, also, the testimony from Ms. Ibanez was not about what is considered a breach under our confidentiality policy. It's what California law and the civil code considers a breach that requires reporting to the person whose information has been breached. It has nothing to do, actually, with the confidentiality policy in this case. Again, it's important to note that whatever possible chill, since Mr. Schaffer is attempting to link any lapses in confidentiality with chill of donors, there has been no chill of donors, even linked to public disclosure. We've talked about this, and it's, in fact, quite the contrary. Getting to Judge Wynn's point about where is the evidence that it is actually necessary to have Schedule B readily accessible, that can be found in the testimony of Steve Bauman at ER 969, of Ms. Ibanez at ER 1014, and of Ms. Johns at ER 590. So, counsel started with the notion that the factual record has really changed. Now, the cases that supposedly make a factual record even particularly relevant are actually not exacting scrutiny disclosure of cases. They are, in fact, speech cases. But even if we were to assume that facts were in some way essential here, they haven't changed meaningfully. There's a bigger record, but the bigger record does not actually show any First Amendment harm that's cognizable arising from any kind of disclosure. And again, that means we don't really need to go further. As this court has said, it is found. Mr. Schaefer seems to be questioning the need to ask all charities up front for Schedule B. However, that's squarely decided by Center for Competitive Politics, and that argument is foreclosed. We also have additional evidence of how it is that the Attorney General uses Schedule B. Just a quick note, Mr. Schaefer is conflating the example, one example that I gave of solving hundreds of millions of dollars in gift and kind fraud of cancer charities with another example, LB Research. It is true that LB Research is a private foundation, and so they would be forced to publicly disclose their Schedule B, but that is irrelevant. It still actually shows, the information is the same, and it shows how the Attorney General uses it. The Attorney General was somewhat hamstrung in being able to actually put on evidence of how, in fact, it uses Schedule B. The same legal errors that permeate the district court's order permeate a lot of the evidentiary rulings. So the district court opined at various times that we were really just here to talk about donor privacy. If it didn't have to do with the foundation, Schedule B, we should not talk about it. So there would be more evidence, but what evidence there is more than satisfies our burden under exacting scrutiny. There is, just to finish, no narrow tailoring requirement under exacting scrutiny. And the cases that Mr. Shaffer references that suggest that there are, the reason why there might be is because profound First Amendment harm was already found. It's also the case that in those cases, so in Perry, which is a First Amendment privilege, it has to do with discovery, and the court's very clear that it's limiting its holding to internal campaign strategy communications. There was evidence that, in fact, having to disclose your internal campaign strategy communications would create First Amendment chill. The court said that's self-evident, and that the request needed to be narrowly tailored. Okay. I gave him the last point, and this is it. My point, yeah, is really just that this order cannot withstand any kind of meaningful legal scrutiny, and we again ask that the district court be reversed, the injunction vacated, and judgment entered for the Attorney General. Thank you very much. Thank you, counsel. We appreciate your arguments. It's an interesting case.  Thank you all. And the matter is submitted at this time.
judges: Fisher, Paez, Nguyen